UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FRANK MAIKY BAEZ GUERRERO | Criminal No. 25cr10336 |

**AFFIDAVIT IN SUPPORT OF PRETRIAL DETENTION**

I, Special Agent Andrew Frigon, Drug Enforcement Administration, being duly sworn, depose and state as follows:

**Agent Background**

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since March 2017. I am currently assigned to the Portsmouth New Hampshire Tactical Diversion Squad. Prior to my current assignment, I was assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including the Federal Bureau of Investigation ("FBI"), DEA, Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies. My primary duties at the DEA include the investigation of organized drug trafficking organizations ("DTOs"). I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2. Prior to becoming a DEA Special Agent, I was employed by the New Hampshire Department of Safety, Division of State Police as a State Trooper, and was so employed from

August 2012 to November 2016. I hold a Bachelor of Science Degree in Criminal Justice from Worcester State University.

3. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received training regarding narcotics investigations while attending the Basic Agent Academy in Quantico, Virginia, and have attended additional specialized training courses in furtherance of my past and current assignments.

4. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, and to protect their operations, members, narcotics, and narcotics proceeds.

5. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement’s use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement’s use of electronic

surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

6. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.

7. Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in their residences and in storage sites commonly referred to as "stash houses."

**Purposes of the Affidavit**

8. I submit this affidavit in support of the government's motion for pretrial detention for defendant Frank Maiky BAEZ Guerrero. I served as the lead agent during investigation of BAEZ and his co-conspirators, both charged and uncharged.

9. I participated in the investigation of BAEZ and his co-conspirators (collectively, the "BAEZ DTO") starting in approximately October 2023. This investigation has already resulted in the indictment of 10 BAEZ DTO members for drug trafficking and firearms offenses in November 2024. *United States v. Mendez Herrera, et al.*, 24-cr-10355-DJC, Document No. 62.

10. I have been personally involved in physical surveillance of members of the BAEZ DTO, the DTO's drug and money stash locations, the execution of search warrants for residential locations, and arrest of BAEZ DTO members. I have also authored or contributed to affidavits in support of warrants for those residences, location information for cellular phones, GPS trackers, and the extraction of seized cellular phones, among other investigative activities.

11. During the course of my investigation, I learned that BAEZ's criminal enterprise was responsible for receiving large quantities of fentanyl, cocaine, and methamphetamine in the District of Massachusetts, transporting those narcotics to other judicial districts including the Districts of Maine and New Hampshire, distributing those narcotics, and laundering the proceeds of this narcotics trafficking to the final recipients both inside and outside the United States, including in the Dominican Republic.

12. In March 2024, BAEZ was arrested by agents from Immigration and Customs Enforcement pursuant to a warrant for his arrest, issued by the Dominican Republic, for homicide charges. In June 2024, BAEZ was removed from the United States to the Dominican Republic. BAEZ continued to direct the activities of his DTO from the Dominican Republic.

13. On August 13, 2025, as a result of the investigation into the BAEZ DTO, a federal grand jury returned an indictment charging BAEZ with continuing criminal enterprise, conspiracy to distribute controlled substances, conspiracy to launder money, multiple counts of possession with intent to distribute controlled substances, including methamphetamine, fentanyl, and cocaine, and unlawful use of a communications facility. Docket No. 1.

14. This affidavit is based on my participation in this investigation, my discussions with other agents and law enforcement officers, review of law enforcement reports, materials gathered through subpoena and search warrants, and publicly available sources of information. This

affidavit does not set forth all of my knowledge about this defendant or this investigation. I am providing the information below to the Court to aid its determination of BAEZ's pretrial detention status.

**Facts Supporting the Indictment**

15. At the start of this investigation, a cooperating witness ("CW-1") identified several potential investigative targets, including Ernesto Mendez Herrera, charged in 24-cr-10355-DJC. CW-1 learned that Mendez Herrera worked for the BAEZ DTO and was responsible for transporting fentanyl, methamphetamine, and cocaine from Massachusetts to Maine, distributing the drugs in Maine, and bringing the drug proceeds back to Massachusetts. Through speaking regularly with Mendez Herrera, CW-1 learned that BAEZ was the leader of this DTO. Through CW-1's communications with Mendez Herrera, starting in October 2023, law enforcement authorities identified, in addition to Mendez Herrera, nine additional individuals who worked in BAEZ's DTO. Law enforcement authorities were able to track the individuals responsible for transporting narcotics and narcotic proceeds for BAEZ, leading to the arrest of several co-conspirators and the seizure of narcotics and proceeds from their sale.

16. Through this investigation, and additional investigation described below, investigators learned that BAEZ was the leader of this DTO both from the United States, and from the Dominican Republic after his deportation. DTO members transported fentanyl, cocaine, and methamphetamine from residences in Massachusetts controlled by the DTO to residences in Maine from which they sold the narcotics. Often, in this investigation, when law enforcement authorities lawfully seized narcotics from the DTO members, they would seize liquid, sludge mixtures which contained fentanyl and cocaine, all mixed in large plastic containers. Investigators learned that BAEZ instructed these DTO members to carry plastic containers, milk, and water in their vehicles,

and, if pulled over by police, to attempt to destroy or dilute the narcotics in the containers to avoid arrest.

17. BAEZ identified the residences in Maine from which to traffic narcotics, arranged the payments to the residence owners, paid for the Massachusetts residences in which the DTO stored narcotics and narcotics proceeds, and identified and expanded the DTO's drug customer base in Maine. BAEZ performed these tasks with assistance of his other co-conspirators, some identified below. Through cell phone extractions from phones seized from BAEZ DTO members, investigators learned that BAEZ was in constant communication with Mendez Herrera and other members of the DTO about their activities and regularly discussed drug quantities, drug storage locations, and money payments.

18. Specifically, law enforcement authorities lawfully seized and extracted data from numerous seized cell phones. In the cell phones, law enforcement authorities found lengthy WhatsApp exchanges (calls, text messages, voice memos) between involving BAEZ. Law enforcement authorities identified numerous communications in which BAEZ discussed drug quantities and prices. BAEZ left numerous voice memos recovered from these extractions. For example, on September 19, 2024, Mendez Herrera sent a voice memo to BAEZ in which Mendez Herrera referenced charged co-conspirators Cristofel Baez Guerrero, alias "Rubio," BAEZ's brother ("C. Baez Guerrero") and Yomerli Mendez Arias, alias "Yomel" and "Peca" ("Mendez Arias"), and told BAEZ to "call Rubio and Yomel for the work that had to be paid yesterday." Mendez Herrera continued, "Mel and I told Rubio to save the money. I will travel to you. I'm going to get half a million and two hundred from down here, save the trip for you." Based on experience and training, law enforcement authorities believe that Mendez Herrera was describing C. Baez Guerrero and Mendez Arias selling narcotics ("work"). Law enforcement authorities

further believe that the Mendez Herrera was telling C. Baez Guerrero to save the money earned from drug trafficking so that the Mendez Herrera could collect the drug proceeds and get them to BAEZ ("I will travel to you…half a million and two hundred from down here").

19. Investigators learned that when drug customers paid for narcotics in Maine, they paid either in cash or via online money payment applications like CashApp or Zelle. When they paid with online payment apps, they would show Mendez Herrera, or another DTO member on-site, a screenshot of the money payment to one of BAEZ's co-conspirators ("Co-Conspirator 1") online payment accounts. Then, DTO members would take a photo of the customer's screenshot and send that photo to BAEZ GUERRERO. Law enforcement authorities lawfully recovered numerous screenshots of these payments from DTO members' cell phones. The photos served as receipts that the customers had paid for the narcotics.

*Drug and Gun Seizures from BAEZ DTO*

20. Prior to October 11, 2023, CW-1 told law enforcement authorities that Mendez Herrera was planning to transport narcotics from Massachusetts to Maine to sell to the DTO's Maine-based customers. On October 11, 2023, law enforcement authorities observed Mendez Herrera in the parking lot outside an apartment complex at 500 Broadway, Malden, Massachusetts. Mendez Herrera entered a Toyota Tacoma[1] driven by charged co-conspirator Ricky Reynoso (Reynoso). Mendez Herrera and Reynoso drove the vehicle north into New Hampshire in the direction of Maine. Believing they were transporting narcotics, law enforcement authorities lawfully stopped the Tacoma. Law enforcement authorities lawfully searched the vehicle, found suspected narcotics, lawfully seized them, and sent them to the laboratory for testing. Laboratory

[1] The Toyota vehicles discussed in this affidavit were all rented from the same business, Expressway Toyota, 700 Morrissey Boulevard, Dorchester, Massachusetts

testing confirmed the narcotics contained a detectable amount of fentanyl, weighing 99 grams, and a detectable amount of cocaine, weighing 145 grams.

21. On February 26, 2024, law enforcement authorities observed a Toyota Highlander on the highway in New Hampshire. Law enforcement authorities had observed the Mendez Herrera driving the Highlander two days prior. Law enforcement authorities stopped the Toyota Highlander and identified the driver as C. Baez Guerrero, BAEZ's brother. Law enforcement authorities identified the passenger as charged co-conspirator Luis Castillo (Castillo). Law enforcement authorities searched the Highlander and found a protein powder container filled with liquid sludge inside. This sludge was sent to the laboratory for testing. Laboratory testing confirmed the mixture contained detectable amounts of fentanyl and cocaine, weighing 1,035 grams.

22. Prior to May 30, 2024, law enforcement authorities placed a covert camera outside 500 Broadway, Apartment #1158, Malden, Massachusetts. Law enforcement authorities had observed co-conspirators travel to that apartment and identified it as a likely residence in which the BAEZ DTO stored narcotics for transport to Maine. Law enforcement authorities were able to observe another Toyota Highlander in the parking lot outside 500 Broadway. Law enforcement authorities observed the Highlander drive north from Malden towards Maine and conducted a motor vehicle stop in New Hampshire. While conducting the motor vehicle stop, the passenger of the vehicle jumped out of the vehicle and fled on foot. The driver drove away from law enforcement authorities, also in an attempt to flee, abandoned the vehicle, and fled on foot. Law enforcement authorities were able to find the driver, charged co-conspirator Mendez Arias. In the vehicle, law enforcement authorities seized methamphetamine. The methamphetamine was sent to the laboratory for testing. Laboratory testing confirmed the substance contained a detectable

amount of methamphetamine, weighing 2.26 grams. Law enforcement authorities attempted to locate the passenger who fled and, while following his trail using a police dog, law enforcement authorities found a protein container full of a liquid sludge. This sludge was sent to the laboratory for testing. Laboratory testing confirmed the mixture contained detectable amounts of fentanyl and cocaine, weighing 3,306 grams. Law enforcement authorities eventually located the passenger when he emerged from the woods and jumped into a vehicle. The passenger was taken into custody and identified as charged co-conspirator Estarling Perez Almonte (Perez Almonte).

23. On June 5, 2024, law enforcement authorities were monitoring the covert camera footage outside 500 Broadway in Malden. Law enforcement authorities observed co-conspirator Reynoso approach a Toyota Tacoma in the parking lot. A short time later, law enforcement authorities observed co-conspirators Castillo and charged co-conspirator Raidyn Montero enter the Tacoma. Castillo drove the Tacoma away from 500 Broadway. Law enforcement authorities were able to locate the Tacoma as it drove north into Maine. Believing that Castillo and Montero were transporting narcotics to Maine for sale, law enforcement authorities conducted a motor vehicle stop on the Tacoma. The Tacoma slowly pulled to the side of the road. Law enforcement authorities confirmed that Castillo and Montero were the only occupants of the vehicle. Law enforcement authorities observed powder on the floor and seat, on the passenger side. Law enforcement authorities searched the Tacoma and found a protein powder container filled with liquid sludge inside. This sludge was sent to the laboratory for testing. Laboratory testing confirmed the mixture contained detectable amounts of fentanyl and cocaine, weighing 2,567 grams.

24. In the days leading up to August 21, 2024, Mendez Herrera offered to transport narcotics up to Maine for CW-1. Mendez Herrera put CW-1 in touch with charged co-conspirator

Jose Rodriguez (Rodriguez) to coordinate the narcotics transport. On August 21, 2024, Rodriguez asked if CW-1 had the narcotics to transport, and at law enforcement authorities' direction, CW-1 stated that CW-1 had not been able to obtain the narcotics. Mendez Herrera, who was in communication with Rodriguez, then informed CW-1 that Rodriguez would need to transport the narcotics he had obtained up to Maine, specifically to 75 Lincolnville Road, an address from which the BAEZ DTO sold narcotics. Law enforcement authorities were able to locate Rodriguez in Lawrence, Massachusetts, and followed Rodriguez as he drove north into New Hampshire in the direction of Maine. Law enforcement authorities lawfully stopped Rodriguez's vehicle and confirmed he was the only person inside. Law enforcement authorities lawfully searched the vehicle and found a hidden compartment inside. Inside the hidden compartment, law enforcement authorities found two firearms and large quantities of suspected narcotics and lawfully seized the firearms and suspected narcotics. The suspected narcotics were sent to the laboratory for testing. Laboratory analysis confirmed that one of the mixtures contained a detectable amount of cocaine, weighing 613 grams, and one of the mixtures contained a detectable amount of methamphetamine, weighing 897 grams.

25. After the arrest of the 9 co-conspirators, law enforcement authorities lawfully seized numerous cell phones and lawfully extracted data from them. Law enforcement authorities extracted a conversation between Castillo and BAEZ regarding the August 21, 2024, seizure described above. On August 22, 2024, the day after law enforcement authorities seized approximately 1.5 kilograms of cocaine and methamphetamine from Rodriguez, BAEZ, in a voice memo to Castillo, stated, "Don't sell don't sell, I don't care. I'm going to pay that house. You don't know how to tell Chari that? Did you see they grabbed one of the guys yesterday? What does she want me to do? For them to kill me? They grabbed him for a kilo and a half. And they took his

car. They got him with what? $21,000 I lost with that. You need to tell him that." In the same exchange, Castillo continued, "Okay I'll tell her that. I was also going to tell you, I know you're tight with everything right now but to see if you could give me $1,400 from that and then from the job I did last week you don't have to pay me for that." BAEZ continued, "I'm going to give her money too for what she needs for her room so she can give everything for the month." Based on the earlier reference to "Chari" and the identification of "Chari" as the renter of 500 Broadway, apartment #1158, Malden, Massachusetts, the residence in which the BAEZ DTO stored narcotics and narcotics proceeds, law enforcement authorities believe that BAEZ was discussing paying Chari the rent for the Malden apartment for the next month. Law enforcement authorities believe this payment was in the form of narcotics proceeds and therefore promoted the ongoing narcotics trafficking activities of the BAEZ GUERRERO DTO.

26. In a data extraction from charged co-conspirator Mendez Arias's cell phone, law enforcement authorities identified numerous communications between Mendez Arias and BAEZ. On September 9, 2024, Mendez Arias stated in a voice memo to BAEZ, "Yea you know the people around here like to talk a lot. A dude from Paya [city in Dominican Republic] that was talking about that and I showed him but his business is booming. Cause no one in 4 days is getting sent $11,000 if the business isn't booming. $11 and $12k. BAEZ responded, "Okay, take 10 from that one below ("abajo") and prepare some brown." Mendez Arias responded, "I have some brown." BAEZ sent another voice message stating, "The one that you sent the [inaudible] doesn't work and that's why he didn't pay me. It doesn't work you have to prepare a new one, it doesn't work. he said it the other day and now he's saying it again." BAEZ then sent another voice memo stating, "Grab that same one that doesn't work and put it in with that 10 and then add in 50 more." This communication was followed by a voice call between Mendez Arias and BAEZ. Based on

experience and training, law enforcement authorities believe that BAEZ was instructing Mendez Arias on the ratio of the mixture of the narcotics ("put it in with that 10 then add in 50 more"). Mendez Arias replied, "No cousin you know that I can take that from anyone around here. I'll take it myself to make that for that dude all you got to do is say the word." BAEZ responded with a final command, "No, no. I want you send that to that guy early in the morning." Based on experience and training, law enforcement authorities believe that BAEZ was ordering Mendez Arias to take a drug shipment to a customer.

27. On September 12, 2024, law enforcement authorities were monitoring a GPS tracking device installed on one of the vehicles used by the BAEZ DTO, a Honda CRV. The CRV drove north in the direction of Maine. Law enforcement authorities believed the occupants of the vehicle, Reynoso and charged co-conspirator Waldo Lara Arias (Lara Arias), were transporting narcotics to Maine. In New Hampshire, law enforcement authorities conducted a motor vehicle stop of the CRV. Law enforcement authorities observed spilled milk and powder in the vehicle. Law enforcement authorities lawfully searched the vehicle and found a plastic bottle containing a milky sludge mixture. The mixture was sent to the laboratory for testing. Laboratory testing confirmed that the mixture contained detectable amounts of cocaine and fentanyl, weighing 2,778 grams. Additionally, law enforcement authorities swabbed Lara Arias's hands and sent the swabs to the laboratory for testing. Laboratory testing confirmed the swabs contained a detectable amount of cocaine and fentanyl, indicating that Lara Arias had attempted to destroy or dilute the narcotics during the motor vehicle stop.

28. Law enforcement authorities identified additional conversations between Mendez Arias and BAEZ from Mendez Arias's cell phone. On September 14, 2024, Mendez Arias stated, "Yeah we're in bed. 5 ounces for that dude from the hard. He doesn't want soft." BAEZ responded,

"Yes, the ice tomorrow. Tell him." Based on experience and training, law enforcement authorities know that "hard" is common street slang for crack; "soft" is common street slang for powder cocaine; and "ice" is common street slang for methamphetamine. Mendez Arias then forwarded a screenshot from a message thread from "Condoro," who law enforcement authorities identified as co-conspirator Perez Almonte. The screenshot contained the address 115 Monroe Highway, Brooks, Maine 04921. Law enforcement authorities found this same screenshot in one of Mendez Herrera's cell phones. Law enforcement authorities had identified this address as a residence in Maine from which the BAEZ GUERRERO DTO sold narcotics.

29. On September 14, 2024, in another communication between Mendez Arias and BAEZ, Mendez Arias sent a video to BAEZ of a kilogram brick of narcotics wrapped in tape. Mendez Arias rotated the brick in a 360-degree view to show the exterior of the kilogram to BAEZ.

30. On October 25, 2024, in another message extracted from Mendez Arias's cell phone, Mendez Arias sent BAEZ another video of a kilogram brick of narcotics in vacuum sealed packaging with a "1000" stamped on the top.

31. On October 28, 2024, law enforcement authorities were monitoring the cell phone location data for C. Baez Guerrero's cell phone. Law enforcement authorities observed the phone moving from the Lawrence, Massachusetts area, traveling in the direction of Maine on interstate highways. Law enforcement authorities believed that C. Baez Guerrero, and possibly others, were transporting narcotics from Massachusetts to Maine. Law enforcement authorities were able to locate C. Baez Guerrero's vehicle in Maine and conducted a motor vehicle stop. Law enforcement authorities searched the vehicle and found a plastic container with a liquid sludge mixture, a bag of powder, and a plastic container of powder. These mixtures were sent to the laboratory for

testing. The powder tested positive for fentanyl and cocaine, weighing 64 grams. The liquid mixture tested positive for fentanyl and cocaine, weighing 28 grams.

32. On January 18, 2025, BAEZ posted a video to his Instagram account about the arrests of members of his DTO. In the video post, BAEZ stated the following: "And my biggest happiness would be that my guys that are over there get out of prison." Based on experience and training, law enforcement authorities believe BAEZ was referring to the defendants who were arrested. BAEZ continued, "Why does my money lasts? I don't do drugs or have any vices, I don't smoke drugs. The drugs were made for the white people ("gringo") and the white people is who we bring it to." BAEZ continued, "And whose had 10 employees in Boston, in four years. Find me someone whose had 10 employees. I paid 28,000 a week to my employees. I paid monthly 100,000 – 6 million (pesos) a month for those I employed. I was a magnate. A magnate."

33. Despite the arrest of the individuals working for the BAEZ DTO, BAEZ continued to operate his DTO from the Dominican Republic and simply replaced his now-incarcerated employees. On January 30, 2025, based on information from confidential sources and physical surveillance, law enforcement authorities conducted a motor vehicle stop of a rental vehicle driven by Hanles Arias Gonzalez (Arias Gonzalez). Arias Gonzalez was carrying over $11,000 United States Dollars (USD) in cash. Law enforcement authorities lawfully obtained communications between Arias Gonzalez and BAEZ in Arias Gonzalez's phones. Arias Gonzalez had sent multiple photos of wire remittance receipts to BAEZ showing wire transfers to the Dominican Republic and payments to Co-Conspirator 1. BAEZ sent Arias Gonzalez a photo of a Dominican cedula for Manuel Alejandro Amancio Mendez. A day later, Arias Gonzalez sent BAEZ a photo of a wire remittance to Manuel Alejandro Amancio Mendez in the Dominican Republic. BAEZ also sent

Arias Gonzalez addresses of locations that law enforcement authorities had identified as residences in Maine from which the BAEZ GUERRERO DTO sold narcotics.

34. In March 2025, law enforcement authorities identified a new member of the BAEZ DTO, Clarisio Carmona (Carmona), based on phone records analysis showing regular communications between Carmona and BAEZ. Law enforcement authorities located Carmona's vehicle in Lawrence, Massachusetts. Confidential sources reported that Carmona was planning to transport drugs from Massachusetts to Maine. On March 19, 2025, law enforcement authorities observed Carmona enter his vehicle. Law enforcement authorities continued to surveil Carmona as he drove from Lawrence, Massachusetts, in the direction of New Hampshire and Maine. Believing Carmona was transporting narcotics from Massachusetts to Maine, law enforcement authorities lawfully stopped and searched the vehicle, locating large quantities of narcotics. These narcotics were sent to the laboratory for testing. Laboratory testing confirmed that the suspected narcotics contained a detectable amount of cocaine, weighing 550 grams, a detectable amount of cocaine base (crack cocaine), weighing 19 grams, and a detectable amount of fentanyl, weighing 20 grams. Law enforcement authorities found numerous communications with BAEZ on Carmona's phone. In a message thread between Carmona and BAEZ, law enforcement authorities found numerous screenshots of CashApp transactions showing payments to Co-Conspirator 1's CashApp account.

*Money Laundering*

35. On October 6, 2024, in another message extracted from Mendez Arias's cell phone, BAEZ scolded Mendez Arias for not collecting the correct amount of money from drug customers, stating, "Yomel the $150 is in the wind. You guys couldn't even do that. Sunday since yesterday I've been telling you about the money. And look at that. The money was incomplete." Mendez

Arias then sent a screenshot of a $150 money payment made to Co-Conspirator 1 from a checking account, showing that the money had been paid.

36. Lawfully obtained financial records show that, in June 2023, Co-Conspirator 1 opened checking and savings accounts at Bank of America. Co-Conspirator 1 has deposited more than $375,000 USD into Co-Conspirator 1's accounts since the account opening through March 2025. None of the deposits are indicative of any legitimate employment income, but rather the deposits consist primarily of cash ($55,378 USD), peer-to-peer Zelle transfers from various individuals ($59,402 USD), and transfers from funds collected in Co-Conspirator 1's CashApp accounts ($255,881 USD).

37. The Zelle transfers into Co-Conspirator 1's Bank of America accounts include transfers directly from BAEZ totaling more than $17,000 USD, as well as transfers from other co-conspirators and associates, including BAEZ's brother C. Baez Guerrero. Other Zelle senders include an individual who regularly rented vehicles for the BAEZ DTO from Expressway Toyota in their name. Another individual collected payment transfers directly from drug customers similar to Co-Conspirator 1. This layering of funds, collecting drug payments into one account only to move the funds into a secondary account held by another, is a common money laundering technique utilized to help conceal and disguise the source, ownership, and control of the illicit funds collected. Similarly, utilizing multiple individuals to collect customer payments, rather than a single individual, is another common concealment method.

38. The $350,000 USD funds deposited into Co-Conspirator 1's Bank of America accounts, including the CashApp transfers, were ultimately disbursed and utilized by the BAEZ DTO in various ways. For example, Co-Conspirator 1 transferred approximately $54,000 USD directly to BAEZ via Zelle and sent an additional $2,550 USD via Zelle to co-conspirator Reynoso.

Approximately $85,000 USD was withdrawn at ATMs located in the Dominican Republic, the majority of which occurred in June 2024 and later, during which time BAEZ had been removed back to the Dominican Republic. Approximately $6,200 USD was paid to Enterprise Rent-A-Car and Expressway Toyota. The investigation has revealed that members of the BAEZ GUERRERO DTO often rented vehicles to transport drugs from Massachusetts to their customers located in Maine.

39. In addition to the various Cash App accounts identified by searching BAEZ DTO cell phones seized at arrest, law enforcement authorities also identified photographs of numerous money transfer receipts depicting transfers of funds from locations primarily in Massachusetts and sent to various receivers in the Dominican Republic. Law enforcement authorities lawfully obtained detailed money transfer records from several different money service businesses reflecting transfers involving the names of known members of the BAEZ DTO. In total, law enforcement authorities identified approximately $130,000 USD in money transfers sent in 2023, approximately $150,000 USD sent in 2024, and approximately $15,000 USD sent in the first two-plus months in 2025.

**CONCLUSION**

40. On March 3, 2026, BAEZ was arrested in the Dominican Republic pursuant to the extradition request filed by the government and based on the indictment described above. When he was arrested, he was driving a vehicle. From inside the vehicle, investigators seized a handgun with no serial number, one 30-round magazine, one ten-round magazine, and 37 total rounds of 9mm ammunition.

41. This affidavit sets out some of the evidence investigators have gathered supporting the criminal charges against BAEZ. I respectfully submit it in aid of the Court's determination of BAEZ's pretrial detention status.

Signed under pains and penalties of perjury this 19th day of May 2026.

ANDREW FRIGON

Digitally signed by ANDREW FRIGON
Date: 2026.05.19 10:50:27 -04'00'

Andrew Frigon, Special Agent
Drug Enforcement Administration